**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-16499 |
| *Plaintiff-Appellee*, | D.C. No. 3:20-cv-00158-MMD-CSD |
| v. | |
| $1,106,775.00 IN UNITED STATES CURRENCY, | OPINION |
| *Defendant-Appellant*, | |
| and | |
| OAK PORCELLI, | |
| *Claimant-Appellant*. | |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted May 14, 2024
San Francisco, California

Filed March 11, 2025

Before:  Kenneth K. Lee and Daniel A. Bress, Circuit Judges, and John R. Tunheim,[*] District Judge.

Opinion by Judge Lee;
Dissent by Judge Bress

## SUMMARY[**]

### Civil Forfeiture

The panel affirmed the district court's orders (1) striking Oak Porcelli's claim opposing the United States government's complaint for civil forfeiture against $1,106,775 in currency that Drug Enforcement Agency officers seized following Porcelli's traffic stop; and (2) granting the government a default judgment of civil forfeiture against the currency.

Porcelli challenged the government's authority to seize the currency, demanded its return, and moved to suppress evidence obtained during the traffic stop, arguing lack of probable cause to stop him or search his vehicle. After Porcelli filed his claim, the government served him with interrogatories, pursuant to Supplemental Rule of Civil Procedure G(6) for Forfeiture Actions in Rem, asking him, among other things, to describe how he obtained the money. Despite repeated orders, Porcelli refused to answer

---

[*] The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the interrogatories fully, asserting that he had already established Article III standing at the pleading stage by claiming ownership.

The panel held that the district court did not abuse its discretion in striking Porcelli's claim asserting ownership when he repeatedly refused to amend his vague interrogatory responses, even though it would not have been burdensome to provide additional information and the government's own evidence cast doubt on his ownership. Pursuant to Rule G(6) and this court's case law, the government can seek narrow discovery about a claimant's standing, including serving special interrogatories about the claimant's "relationship" to the seized money "at any time" during discovery after a claim is filed, not just at the pleading stage. While the government ultimately has the burden under the Civil Asset Forfeiture Reform Act to show by a preponderance of evidence that the money was subject to forfeiture, Porcelli still had a discovery obligation under Rule G(6) to provide some evidence that he has Article III standing to claim the money. The panel held that the district court did not have to rule on Porcelli's pending motion to suppress before ruling on the government's Rule G(8) motion to strike.

Dissenting, Judge Bress stated that Porcelli sufficiently responded to the Rule G(6) interrogatories about his standing, at least enough to avoid the total dismissal of his claim at the very beginning of the case. Although this may seem like a technical case about discovery responses, it portends a significant and ill-founded change in how civil asset forfeiture proceedings will be conducted and is a serious overextension of the Supplemental Rule G(6) interrogatory device for civil forfeiture cases. If a claimant is challenging the search that led to the forfeited property,

the sufficiency of the claimant's Rule G(6) interrogatory responses must be evaluated with the motion to suppress in mind. Through its short-circuiting of the proper processes, the majority's ratification of the government's approach contravenes this court's precedents, improperly shifts the statutory burden of proof, and allows the government to avoid important Fourth Amendment inquiries into its searches and seizures.

## COUNSEL

Daniel D. Hollingsworth (argued) and Adam M. Flake, Assistant United States Attorneys; Robert L. Ellman, Assistant United States Attorney, Appellate Chief; Jason M. Frierson, United States Attorney; Office of the United States Attorney, United States Department of Justice, Las Vegas, Nevada; Peter Walkingshaw, Assistant United States Attorney, Appellate Division, Office of the United States Attorney, Reno, Nevada; for Plaintiff-Appellee.

David M. Michael (argued) and Edward M. Burch, Law Office of Michael & Burch LLP, San Francisco, California, for Claimants-Appellant.

# OPINION

LEE, Circuit Judge:

At first blush, Oak Porcelli appeared like any other cross-country driver on Interstate 80 in Nevada. But with him in the car was money—lots of it. Stacks of cash—over a million dollars—in vacuum-sealed packages were tucked away in the back of the SUV. The fate of that money is the focus of this case. When a highway patrol officer pulled him over for tailgating, Porcelli told him that he was transporting the money as "petty cash" for a movie production company that does not appear to exist. Suspecting that he was involved in drug trafficking, the officer seized the money, and the government then filed a complaint for civil forfeiture. Porcelli protests the taking of that money.

We do not address the ongoing larger debate about civil forfeiture, despite Porcelli's implicit invitation to do so. Rather, we focus on the narrow and technical discovery issue presented by this appeal: Whether Porcelli complied with Supplemental Rule of Civil Procedure G(6), which permits the government to serve special interrogatories "at any time" after the forfeiture claim is filed. The government asked, among other things, how Porcelli obtained the money. Porcelli refused to answer the interrogatories fully, despite the court's repeated orders to do so. As allowed by Supplemental Rule G(8), the district court then struck Porcelli's claim opposing the forfeiture and granted default judgment for the government.

On appeal, Porcelli challenges the district court's orders, arguing that the interrogatories went beyond the scope of Rule G(6) and that the district court essentially flipped the burden of proof. We reject these arguments. Rule G(6)

allows the government to seek narrow discovery about the claimant's standing to challenge the forfeiture: It can serve special interrogatories about the claimant's "relationship" to the seized money "at any time" after a claim is filed. The government can thus serve them—even if a claimant has shown Article III standing at the pleading stage by merely asserting the money in his possession is his—if there is a reasonable dispute about whether the claimant will be able to show standing later in the case.

We hold that the district court did not abuse its discretion in striking Porcelli's claim when he repeatedly refused to amend his vague interrogatory responses, even though it would not have been burdensome to provide additional information and the government's own evidence cast doubt on his ownership. While the government ultimately has the burden to show by a preponderance of evidence that the money was subject to forfeiture, Porcelli still has a discovery obligation under Rule G(6) to provide some evidence that he has Article III standing to claim that the money is his. We, however, stress that district courts must carefully exercise their discretion based on the specific facts of each case, and should be wary of overly aggressive government agents and lawyers who may try to misuse the Rule G(6) discovery process.

## BACKGROUND

### I. Porcelli travels the United States with a million dollars in cash.

In November 2019, Oak Porcelli embarked on a cross-country road trip with a passenger, Gina Pennock,[1] in a black Chevy Tahoe with Florida license plates. While headed west

---

[1] Pennock is not a party to this appeal.

on Interstate 80 near Reno, Nevada, Porcelli tailgated the car in front of him.  A highway patrol officer saw this and pulled him over.

During the traffic stop that followed, Porcelli's trip west took a sharp turn south.  The highway patrol officer noticed that Porcelli's SUV smelled like marijuana.  He also saw that the backseat was full of luggage.  The officer asked for Porcelli's license and registration, and Porcelli handed over an Oregon license and a rental car agreement from North Carolina.

Porcelli explained that he and Pennock were headed to Porcelli's home in Portland after skiing in Colorado.  The officer found this odd, as no ordinary route from Colorado to Oregon would pass through Reno.  And that was not all the officer found strange.  When the officer asked Pennock whether she had been snowboarding in Colorado, she said she did not know.  And Porcelli said he and Pennock had started driving west from Buffalo, New York, but their car was rented in North Carolina.

The officer next asked Porcelli whether his SUV contained any "weapons, humans, drugs, illicit currency," "marijuana," "large amounts of U.S. currency," or anything else noteworthy.  Porcelli said that it did not, but the officer heard Porcelli's voice change when talking about marijuana and currency.  Pennock agreed that there were no drugs or currency in the SUV.

A different officer walked his drug-detection canine around the vehicle.  When the canine alerted the officer of potential drugs in the car, Porcelli said the dog might have smelled food inside the vehicle.  When the officer explained that the dog would not respond to the smell of food, Porcelli admitted that he had a marijuana vape pen in the SUV.

## II.  Officers search Porcelli's SUV and discover the cash.

Based on Porcelli's admission and the dog alert, the officers searched the SUV.  Inside, they found a suitcase containing women's clothing and vacuum-sealed plastic bags of U.S. currency.  When officers asked how much money Porcelli was transporting, he said it was "quite a bit."

When the officers asked why Porcelli was transporting so much cash, he explained that he was a movie producer. He said his employer did not like to use a bank and that the "cash flow" came from "Wall Street."  As the officers continued to search the vehicle, they found additional bags of currency, primarily rubber-banded $20 bills, vacuum-sealed and zip-tied between snowboards.  Pennock "guessed" that the packaging may have been meant to "block odors."

## III.   The DEA seizes the currency.

Suspicious that the money was involved in the illegal drug trade, the officers seized the currency and called the Drug Enforcement Agency (DEA).  During questioning by a DEA agent, Porcelli's story shifted.  He now said that he had traveled from Portland to New York City to work on a movie, and he was returning to Portland to work on another movie.  The agent asked what the movies were called, and Porcelli said they were untitled.  Porcelli also said he was transporting the currency on behalf of his employer, 401 Productions, and that it was "petty cash" meant for "miscellaneous expenses on the movie set."   Porcelli disclaimed ownership of all but $2,000 or $3,000, which he said his employer gave him to cover travel expenses.

While the DEA interviewed Porcelli and Pennock, an officer laid out the bags of currency and walked a second drug detection canine past them. The dog alerted to the smell of drugs, and the DEA seized the currency. In total, Porcelli was carrying $1,106,775. Over $700,000 of that was in $5, $10, and $20 bills.

## IV. The government files a complaint for civil forfeiture.

After seizing the currency, the government investigated Porcelli's story, but it could not corroborate it. The government did, however, find that in 2012, a package containing over eleven pounds of marijuana was delivered to Porcelli while he was staying at a hotel in Buffalo. And in 2016, Porcelli was caught trying to ship thousands of dollars wrapped in Mylar (a polyester film) through FedEx. That money was seized, and Porcelli never produced any proof that it was legitimately his.

The government also sent out forfeiture notices to every business called "401 Productions" it could find. Only one—a production company in New York—responded. It denied ownership of the currency, so the government filed a complaint for civil forfeiture against the defendant currency, alleging that it was the proceeds of an illegal drug trade.

## V. Porcelli files a claim asserting ownership of the currency.

After the government filed its civil forfeiture complaint, Porcelli changed his story again and filed a claim asserting that he was the sole owner and possessor of the currency. As the claimed owner, Porcelli challenged the government's authority to seize the currency and demanded that it be returned to him. He also moved to suppress evidence

obtained during the traffic stop, arguing that there had not been probable cause to stop him or search his vehicle.

While Rules 26 through 37 are the bread-and-butter of discovery-related rules, the Federal Rules of Civil Procedure also has more exotic fare—Supplemental Rules for specialized areas of law, including Supplemental Rule G for Forfeiture Actions in Rem. And Supplemental Rule G(6) permits the government to issue special interrogatories about the claimant's identity and relationship to the property at "any time" after a claim is filed. So once Porcelli filed his claim, the government served him with a set of interrogatories. The interrogatories asked Porcelli to identify himself, describe "the nature and extent of [his] interest(s) in the property," explain "how [he] acquired [his] interest(s) in the property," and identify "every document" related to a transaction involving the property. They also asked him to list any change of form the property took while in his possession, provide contact information for anyone who might have an interest in the property, and identify anyone who knew about his "acquisition, possession, or ownership of the property."

In response, Porcelli identified himself, then said, "I own all of the Defendant currency seized from the vehicle I rented and had just been driving, and consequently I had and have a right to possess it and otherwise exercise dominion and control over it." He objected to the rest of the interrogatories, asserting that he already established Article III standing by claiming ownership and the interrogatories could thus serve no relevant purpose under Rule G(6). He then served the government with his own discovery requests.

The government moved to compel Porcelli to respond more fully or strike his claim under Supplemental Rule G(8),

which authorizes sanctions for refusing to comply with special interrogatories. The government also moved to stay Porcelli's discovery requests until Porcelli fully responded. A magistrate judge overruled Porcelli's objections to the interrogatories, compelled him to respond, and stayed his discovery requests. The district court judge affirmed, finding that Porcelli's responses were "indistinct and evasive."

Porcelli supplemented his interrogatory responses, but only barely. He added that he "earned [his] money . . . by working in the movie industry for 15 years, from ~1995-2010, and saving it." He explained that most of the money originated as cash from "a mix of funding entities: individual investors up to large studios like Paramount, MGM, Disney and others." He then provided a link to his IMDB page, which confirms that he worked in the movie industry. Porcelli did not respond to the interrogatories asking him to identify anyone else who may have an interest in the property, transactions involving the property, or changes in form the property took while in his possession.

The government remained dissatisfied with Porcelli's answers, so it once again moved to compel him to respond or strike his claim. The district court again ordered Porcelli to respond, warning him that if he failed to do so, the district court would strike his claim. Porcelli missed the deadline to submit supplemental responses, but rather than strike his claim, the district court provided him a third opportunity to respond.

Porcelli passed on the opportunity. He informed the government and the district court that he would stand on his existing responses, predicting that this would "lead [the parties] out of the District Court and to the Ninth Circuit."

The government then moved to strike his claim for failing to comply with the special interrogatories, and the district court granted the motion. In doing so, it cited Porcelli's repeated refusal to comply with its orders.

Once Porcelli's claim was struck, the government moved for default judgment of forfeiture. The district court entered default judgment, and Porcelli timely appealed.

## STANDARD OF REVIEW

We review the district court's order striking a claim for abuse of discretion. *United States v. $133,420 in U.S. Currency*, 672 F.3d 629, 637 (9th Cir. 2012). We review whether a claimant has Article III standing, as well as interpretations of statutes and rules, de novo. *United States v. Real Prop. Located at 17 Coon Creek Rd.*, 787 F.3d 968, 972 (9th Cir. 2015).

## DISCUSSION

### I. The district court did not abuse its discretion when it compelled Porcelli to respond or struck his claim based on his refusal to comply.

In civil forfeiture cases, the government may "serve special interrogatories limited to the claimant's identity and relationship to the defendant property without the court's leave at any time after the claim is filed and before discovery is closed." Supp. R. G(6)(a). This grants the government somewhat broader—and earlier—discovery power than it has in other civil cases. Rule G(6) gives the government a tool to test the claimant's standing by allowing "the government to collect information regarding the claimant's 'relationship to the defendant property.'" *$133,420*, 672 F.3d at 642. And because a claimant's relationship to property overlaps with the merits of a forfeiture claim, these

interrogatories will likely produce information the government can use to prove its case. *Id.*

Although it is more favorable to the government than other discovery rules, Rule G(6) does not authorize boundless one-sided discovery. The government may only use it to seek information about a claimant's standing—meaning, his "identity and relationship to the defendant property." *Id.* And the government may only ask interrogatories, not request documents or take depositions. *Id.* at 643 n. 5.

Refusing to comply with discovery obligations—including Rule G(6)—comes at a cost. Supplemental Rule G(8) allows the government to move to strike claims "for failing to comply with Rule G(5) or (6)." Although the advisory notes caution that "[n]ot every failure to respond to [Rule G(6)] interrogatories warrants an order striking the claim," they also note that the "special role" interrogatories play in evaluating standing "may justify a somewhat more demanding approach than the general approach to discovery sanctions under Rule 37." Supp. R. G advisory committee's note (subsection (6)).

## A. Rule G(6) permits the government to interrogate standing at all stages of the case—not just the pleading stage.

Despite the broad text of Rule G(6), Porcelli implies that it only allows the government to seek information necessary to test a claimant's standing at the pleading stage. Porcelli contends that he has shown standing—at least at the pleading stage—because the money was in his possession when it was seized, and he has since claimed ownership of it. And because he has met the standing threshold for now, he maintains that he did not have to respond to the special

interrogatories related to standing and that the district court abused its discretion in striking his claim. This argument fails for three reasons.

First, the text of Rule G(6) undermines Porcelli's argument: It says that the government may serve special interrogatories "at any time after the claim is filed and before discovery is closed." Supp. R. G(6)(a). In other words, the government may use Rule G(6) interrogatories to obtain information about a claimant's standing throughout a forfeiture proceeding. And standing can be challenged "at any stage" of the case, including at summary judgment and "even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). It must also be shown "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

So while an unequivocal assertion of ownership may be enough to show standing at the pleading stage, the government can still challenge standing at a later stage when the claimant must meet a higher burden. *$133,420*, 672 F.3d at 638. Here, the government had reason to question Porcelli's claim of ownership because it was "controverted" by other evidence (*e.g.*, history involving forfeited funds). *United States v. JP Morgan Chase Bank Acct. No. Ending 8215*, 835 F.3d 1159, 1165 (9th Cir. 2016). By allowing the government to serve interrogatories "at any time," Rule G(6) contemplates that the interrogatories can be used to obtain discovery to challenge claimant's bare assertion of ownership later in the case. *See id.* Perhaps the responses to the government's special interrogatories will not be useful until later in the case, when the claimant must satisfy a higher burden to prove standing. But that accords with normal discovery principles. Litigants are never permitted

to rest on their laurels when they file a complaint that could survive a motion to dismiss. They must respond to discovery requests that are geared towards future proceedings.[2]

Second, Porcelli's interpretation of Rule G(6) potentially renders another provision in Rule G superfluous. Porcelli suggests that Rule G(6) can only be used to seek discovery to challenge standing at the pleading stage and that other uses of Rule G(6) special interrogatories are improper. But under Supplemental Rule G(8), courts may strike claims because of a failure to either (1) prove Article III standing, or (2) comply with Rules G(5) and G(6). Supp. R. G(8)(c)(i). So if Rule G(6) only applied to claimants who lack standing, then any claim that could be struck for skirting Rule G(6) could also be struck for lack of standing. There would thus be no reason to list the failure to comply with Rule G(6) and the lack of standing as separate reasons for striking a claim. *See $133,420*, 672 F.3d at 643 (noting that we should not interpret a section of Rule G to be superfluous).

---

[2] Porcelli also argues that, by asserting an ownership interest in property that was seized from his possession, he additionally satisfies his summary judgment burden to prove standing. *See $133,420*, 672 F.3d at 639. *$133,420* provided those conditions as examples of evidence that *may* allow a claimant to survive summary judgment. *Id.* But the basic summary judgment test remains "whether 'a fair-minded jury' could find that the claimant had standing on the evidence presented." *Id.* at 638 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). We do not read our precedent to create a per se rule that a fair-minded factfinder could always find standing when a claimant asserts an ownership interest, no matter how dubiously, and the property was seized from their possession. *See JP Morgan Chase Bank Acct. No. Ending 8215*, 835 F.3d at 1165. In any event, discovery may help the government contest standing at trial even if a claimant can survive summary judgment.

Third, our case law confirms our holding that Rule G(6) permits the government to serve interrogatories even if a claimant has shown Article III standing at the pleading stage. In *$133,420*, we endorsed interrogatories that were virtually identical to those here because Rule G(6) "broadly allows the government to collect information" needed to "test the veracity of [a] claim of ownership." *Id.* at 642. Then, in *17 Coon Creek*, we held that "where a claimant's Article III and statutory standing are *not reasonably in dispute*, his failure to respond to Rule G(6) special interrogatories does not, in itself, warrant striking his claim." 787 F.3d at 977 (emphasis added). In other words, the government cannot use Rule G(6) to probe standing if there is no dispute about standing because presumably such discovery would be irrelevant. But here, Porcelli's standing is "reasonably in dispute," even if he passed the low bar at the pleading stage. And he "persistent[ly]" ignored the district court's orders to provide information needed to resolve the dispute—which, as we said in *17 Coon Creek*, is a "discovery violation" that warrants striking his claim. *Id.* at 975, 978 n.4.

In short, Rule G(6) means what it says: The government can ask claimants about their "relationship to the defendant property" at any stage of the proceeding, even if the claimant met their burden to establish Article III standing at an earlier stage of the proceeding. The government's request for Porcelli to elaborate on his dubious ownership claim thus did not exceed the scope of the rule.[3]

---

[3] Indeed, even if some of the government's interrogatories were unduly broad—such as those asking Porcelli to identify anyone who might have an interest in the property—many of them sought only limited information necessary to evaluate his ownership claim. Porcelli refused

**B. Permitting the government to submit special interrogatories does not shift the burden of proof to the claimant.**

Porcelli next argues that requiring claimants to answer special interrogatories after they have established Article III standing at the pleading stage essentially shifts the burden of proof in civil forfeiture cases from the government to the claimant.  We disagree.

In 2000, Congress adopted the Civil Asset Forfeiture Reform Act (CAFRA).  Pub. L. No. 106-185, 114 Stat. 202; *United States v. $80,180 in U.S. Currency*, 303 F.3d 1182, 1183 (9th Cir. 2002).  Before CAFRA, claimants had to prove by a preponderance of the evidence that their assets had been legally obtained and were thus not subject to forfeiture.  *$80,180*, 303 F.3d at 1184.  To make civil forfeiture more favorable to claimants, CAFRA flipped that burden of proof to the government.  *Id.*;  18 U.S.C. § 983(c)(1).  So under CAFRA, once a claimant proves that they have Article III standing, the government must prove that the defendant property is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1).

Porcelli argues that, if the government can use Rule G(6) to ask how a claimant obtained his property, it effectively shifts the burden to the claimant because he or she has to provide information about the ownership of the money.  Admittedly, the Article III standing inquiry significantly overlaps with the merits.  But in the end, this case still boils down to a discovery dispute—not substantive civil forfeiture

---

to provide any response to these interrogatories, which permitted the district court to impose the discovery sanction of striking his claim even if some of his responses did not warrant that sanction.  *Cf. $133,420*, 672 F.3d at 643 n.5.

law. Discovery often forces defendants to turn over information related to the merits that they would rather keep secret, but that does not mean the burden of proof has shifted to them.

In an antitrust case, for example, a defendant company might be compelled to offer up its communications with competitors. *See, e.g.*, *In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299, 307 (S.D.N.Y. 1982) ("These interrogatories are of the sort typically permitted in large antitrust cases."). The company cannot refuse to respond by asserting that the plaintiff has the burden of proof and that complying with this discovery request effectively shifts the burden of proof to the defendant. The defendant still has an obligation to provide discovery, whether it be about standing or the merits. Such a refusal would invite sanctions—including harsh ones like adverse inferences or dismissed lawsuits. *See, e.g.*, *In re Exxon Valdez*, 102 F.3d 429, 433 (9th Cir. 1996) (affirming dismissal for "continued noncompliance" with discovery obligations). No one would argue that these normal discovery practices flip the burden of proof.[4]

Judge Bress' thoughtful dissent offers a more nuanced burden-shifting argument. The dissent rejects Porcelli's claim that he had no duty to comply with Rule G(6) merely because he could claim at the pleading stage that the money in his possession was his. Rather, the dissent contends that Porcelli provided "a reasonable amount of information to allow the government to conduct further discovery into the

---

[4] Rule G(6) is also far less consequential than Porcelli suggests. Even if the government did not serve the interrogatories here under Rule G(6), it could have served them during regular discovery. *See* Fed. R. Civ. Pro. 26; *$133,420*, 672 F.3d at 643 n.5 (noting that the government served identical interrogatories under Rules G(6) and 26).

claimant's standing." Dissent at 59. And by striking the claim for Porcelli's failure to further amend his interrogatory responses, the district court effectively put the burden on Porcelli to prove the money was his, according to the dissent.

We disagree. The government still must show by a "preponderance of evidence" that the seized asset is subject to forfeiture. 18 U.S.C. § 983(c)(1). But the claimant must also meet his threshold requirement that he has Article III standing to challenge the forfeiture (*i.e.,* he has been injured because his money was taken away). And Rule G(6) allows the government to serve interrogatories about the claimant's "relationship to the defendant property" at "any time" during the litigation. In assessing the reasonableness of the government's Rule G(6) interrogatories and the sufficiency of the claimant's responses, the district court should be mindful not to impose case-terminating sanctions if full compliance with the interrogatories would effectively require the claimant to prove his case by a preponderance of evidence. But the claimant still has to offer *some* evidence—though not a preponderance of evidence on the merits—that he has standing (*i.e.*, some evidence that the money is his).[5]

---

[5] Because Rule G(6) is limited to interrogatories about the "claimant's identity and relationship to the defendant property," there is a practical difference between (i) what Porcelli would have to provide under Rule G(6) and (2) the preponderance of evidence that the government must show to prevail on the merits. For example, Porcelli could have responded to interrogatories that he earned on average $150,000 a year during his 15 years working in Hollywood and saved his money to show his "relationship to the defendant property." On the merits, the government would still have to show by a preponderance on the merits that Porcelli's claim is not true through discovery likely not allowed under Rule G(6) (*e.g.*, obtaining credit card bills to show he could not have saved sufficient money).

In our case, we can see this interplay between CAFRA's imposition of burden of proof on the government and the claimant's obligation to respond to Rule G(6) interrogatories about standing. In response to Rule G(6) interrogatory asking how he obtained the $1,106,775 in cash found in his car, Porcelli first responded that it was his money. Then the district court ordered him to provide a more detailed response, and he said that the money was from his prior jobs. The dissent believes that this amended response was adequate. The district court, however, did not and ordered Porcelli to provide more information twice, but he refused both times and the court struck his claim.

Perhaps the district court would have been within its discretion to find Porcelli's responses adequate or to not strike his claim even if it found them to be insufficient. But we cannot say that the court abused its discretion in striking his claim for his repeated refusal to amend his interrogatory responses. It may well have considered Porcelli's amended response—that he had the $1,106,775 in cash from his past jobs—to be unsatisfactory because a claimant can always make such an assertion with minimal details. To be clear, Porcelli's interrogatory responses did not have to prove by a preponderance of evidence that the money was his to avoid dismissal of his claim—that is still the government's burden under CAFRA. But a district court could have found that Porcelli needed to provide a bit more factual information (*e.g.*, his annual salary at his job) in response to the government's interrogatories about his standing. Otherwise, the stock response from every claimant would be, "The money is mine because I had a job at Acme Company." Porcelli's refusal to comply with the district court's discovery orders was particularly perplexing because it would not have been burdensome to provide a bit more

information. Yet he refused to do so. He learned the hard way that it is never a smart litigation strategy to openly and repeatedly defy a court's orders.[6]

We thus find that the district court did not abuse its discretion in striking the claim because (a) the government cast serious doubt on Porcelli's standing through its own evidence (*e.g.*, earlier history of receiving packaged money that was later forfeited), (b) Porcelli provided only vague interrogatory responses about the source of the $1,106,775 in cash, even though it would not have been burdensome to provide more details, and (c) he defied the court's order to amend his interrogatory responses about standing and provided no explanation for his failure to do so.

District courts across the country regularly make these types of discovery rulings, taking into account the need for discovery, the burden imposed on the party, the proportionality between the burden and the need, the party's compliance with discovery orders, and other considerations. If the facts are egregious enough, courts will sometimes issue terminating sanctions. And that is what the district court did here.

---

[6] The dissent repeatedly points out the severity of a case-ending discovery sanction and contends that Porcelli had provided sufficient information in response to the interrogatories. We agree that terminating sanctions should not be issued lightly. But flouting court's discovery orders should not be done lightly, either. The district court ordered Porcelli to further amend his responses and warned him that failing to do so would lead to a termination. He, however, refused to do so. The district court gave him another chance to amend them. He again declined. He made a calculated litigation gamble of inviting terminating sanctions, asserting that he will be "out of the District Court and to the Ninth Circuit" and that he "feels confident that [he] will prevail there." That gamble did not pay off.

**C. The district court did not have to rule on the pending motion to suppress before ruling on the Rule G(8) motion to strike.**

The dissent also argues that the district court should not have considered the amount found in Porcelli's car in deciding the parties' discovery dispute because there was a pending motion to suppress that fact. We disagree.

As the dissent concedes, many circuit courts have held that a claimant cannot move forward with his motion to suppress until he has first established standing because Article III standing is a threshold issue that courts must resolve. *See, e.g.*, *United States v. $39,000*, 951 F.3d 740, 742 (6th Cir. 2020) ("Before determining whether the government lawfully seized the defendant property, [claimant] must establish that he has standing to challenge the lawfulness of seizure. *See* Supplemental Rule G(8)(a)"); *United States v. $321,470*, 875 F.2d 298, 300 (5th Cir. 1989) (holding that it was unnecessary to rule on motion to suppress because the claimant lacked Article III standing);*United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2nd Cir. 2014) ("Without standing, the claimant lacks the right to bring any motion, regardless of the basis"); *United States v. $1,185,135*, 320 Fed.Appx. 893, 894 (11th Cir. 2008) (claimant "must first establish standing in order to raise the suppression claim"). In contrast, no circuit court has held the opposite and required a district court to address a motion to suppress before ascertaining Article III standing.

True, our court has held that we cannot consider the amount of money in deciding the *merits* of a forfeiture claim *if* the court has already ruled that the money was illegally seized. *See United States v. $493,850.00*, 518 F.3d 13 1159, 1170 (9th Cir. 2008). But as the dissent acknowledges, we

have not expressly addressed whether a district court can consider the amount of money in resolving a discovery dispute before it addresses the motion to suppress.  Dissent at 36.

In our case, the district court did not consider the amount of money in ruling on the merits of the forfeiture claim (which it cannot do under our court's precedent) or even the standing question (which it likely can do if we follow other circuits' precedents).  The district court considered the amount of money solely to resolve the sufficiency of discovery responses; the fact that the court ended up striking the claim as a sanction can be attributed in large part to Porcelli's repeated refusal to comply with the district court's orders.

We also point out that in resolving discovery disputes, a court generally does not have to decide beforehand whether a certain piece of evidence will ultimately be admissible. Suppose a plaintiff seeks discovery on potentially embarrassing subjects that may ultimately be inadmissible because it may not fall within a hearsay exception or pass muster under Federal Rule of Evidence 403, and the defendant refuses to turn over discovery on those grounds. The district court has the discretion to sanction the defendant for not fulfilling his discovery obligations, even if it turns out that the discovery would not have been admissible at summary judgment or trial.  Likewise here, we think the district court could have considered the amount of money in determining the sufficiency of Porcelli's interrogatory responses, even if the court could have later deemed the amount of money inadmissible at summary judgment or trial.

To be clear, our decision does not allow the government to evade its burden of proof imposed by CAFRA. The government still has the burden to prove by a preponderance of evidence that the money is subject to forfeiture. The district court must ensure that the Rule (G)(6) special interrogatories are not so broad and far-reaching that fully complying with them would effectively require the claimant to show by a preponderance of evidence that the money is his. A district court thus should not strike a claim willy-nilly based merely on the failure to fully comply with Rule G(6) interrogatories. As the advisory notes to Rule G explains, "[n]ot every failure to respond to [Rule G(6)] interrogatories warrants an order striking the claim." Supp. R. G advisory committee's note (subsection (6)).

The district court can consider factors such as (1) whether the government has produced its own evidence casting doubt on standing, (2) the burden imposed on the claimant to respond to the interrogatories, (3) the reasonableness of the government's interrogatories, (4) whether claimant has acted in good faith in meeting its discovery obligations, and other typical considerations that district courts take into account in deciding discovery issues. For example, an interrogatory that requires precise information (*e.g.*, dates, amount) for dozens of transactions dating back years may be improperly onerous because it would require the claimant to search and find voluminous documents to answer it. On the other hand, other information (*e.g.*, approximate annual salary) may be more easily obtainable and reasonable in some contexts. And, of course, the individual facts of each case matter. For example, if the amount at issue had been only $1,000, then the district court may have found sufficient Porcelli's vague response that the money was from his prior jobs. A district

court should carefully consider the individual facts to ensure that the government is not trying to execute an end-run around its burden, and strike a claim only as a last resort.

### D. Our decision is not inconsistent with those of other circuits.

Porcelli finally urges us to follow other circuits, which he believes restrict the government's ability to serve Rule G(6) interrogatories on claimants who have established Article III standing at the pleading stage. His reliance on these cases is misplaced.

First, Porcelli points us to the Sixth Circuit's decision in *United States v. $774,830 in U.S. Currency*, No. 22-3392, 2023 WL 1961225 (6th Cir. Feb. 13, 2023). That unpublished decision is about a claimant's burden to show standing, not Rule G(6) interrogatories. *Id.* at *2. And if anything, the opinion aligns with our holding here—it notes that the district court's decision to strike a claim might have been proper if it were "due to [the claimant's] repeated refusals to participate in certain aspects of the discovery phase" rather than the district court's improper finding that the claimant lacked standing. *Id.* at *5.

Next, Porcelli offers the Eighth Circuit's decision in *United States v. $154,853 in U.S. Currency*, 744 F.3d 559, 564 (8th Cir. 2014), *overruled by United States v. $579,475 in U.S. Currency*, 917 F.3d 1047, 1049 (8th Cir. 2019) (en banc). In *$154,853*, the government conceded that the claimant had earned $4,500 of the seized currency through legal employment. *Id.* For that small subset of the currency, the Eighth Circuit held that the claim could not be stricken for the claimant's failure to respond to the interrogatories because they were not "necessary to determine standing" (*i.e.,* there was no dispute about standing for that seized

amount). *Id.* The opinion does not address whether claimants must respond to interrogatories when their standing is in dispute, but the Eighth Circuit has since suggested that they must. *See United States v. $284,950 in U.S. Currency*, 933 F.3d 971, 975 (8th Cir. 2019) (permitting government to issue additional interrogatories where the claimant's "responses to the special interrogatories actually raised significant questions about his standing").

Finally, Porcelli cites the Seventh Circuit's decision in *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 645 (7th Cir. 2015). But like the Sixth Circuit's decision in *$774,830*, this case is about striking claims for lack of standing, not for a failure to answer special interrogatories. *Id.* at 641. In a footnote, the panel speculated that the district court may have also abused its discretion if it struck the claims for failing to comply with the special interrogatories. *Id.* at 645 n.3. But that footnote is dicta—the district court did not strike the claims on that basis—and no Seventh Circuit cases have followed it.

## II. Guardrails ensure the government does not abuse Rule G(6).

The dissent raises the specter that the government may misuse Rule G(6) by issuing broad interrogatories too early in the proceeding, which could then pressure claimants to prove the case through one-sided discovery. While we share some of the dissent's concerns, we believe that this case presents a narrow question of whether the district court abused its discretion in deciding a discovery dispute under

Rule G(6).  We find that it did not, given the facts of our case.[7]

Besides the trial court's exercise of judgment and cautiousness, there are other sufficient safeguards, despite the dissent's fear that "the government will nearly always win."  Dissent at 30.  Three Rule G limitations help ensure that claimants are not subject to burdensome or exhaustive discovery demands in the early stages of the case that effectively flips the burden of proof.  Those limitations also ensure Rule G(6) interrogatories are limited, narrowly tailored, and proportional to the needs of the government.

First, Rule G(6) only permits the government to serve interrogatories.  *$133,420*, 672 F.3d at 643 n.5 (noting that the government overstepped by asking a claimant to provide documents).  In a forfeiture case, answering interrogatories is often less burdensome than producing documents or testimony because the claimant need only provide information available to him, such as whether the property was ever held in a bank account.

Second, the interrogatories must bear on the claimant's "relationship to defendant property"—or, in other words, Article III standing.  *See* Supp. R. G advisory committee's note (subsection (6)).  Although standing often overlaps with the merits in forfeiture cases, there are still plenty of questions the government cannot squeeze into Rule G(6).  For example, the government could not ask a claimant to

---

[7] The dissent gives the hypothetical of law enforcement making illegal searches, seizing assets, and facing no consequences.  As we explained, we believe there are sufficient safeguards to prevent such forfeitures.  In any event, we doubt law enforcement would feel emboldened to do so because unlawful searches would mean that the evidence would be excluded in criminal proceedings.

explain "why anyone would travel anywhere with [a large amount of money] in a rented vehicle." *$133,420*, 672 F.3d at 643 n.5.  Nor could it ask a claimant to list any income she has received in the last five years.  *Id.*  These questions do not bear on the claimant's standing, so they fall beyond the scope of Rule G(6).

Third, the proportionality rules that govern civil discovery in other cases also apply to the Rule G(6) interrogatories. The interrogatories must be "proportional to the needs of the case," and the "burden or expense of the proposed discovery [cannot] outweigh[] its likely benefit." Fed. R. Civ. Pro. 26(b)(1).  Indeed, this appears to have been our reason for striking the interrogatories in *17 Coon Creek*: Because there was no reasonable dispute over the claimants' standing, the interrogatories were unnecessary and excessive, and the claimant did not have to respond.  787 F.3d at 978.  Conversely here, it would not have been burdensome for Porcelli to provide more details about how he came to possess $1,106,775 in cash in response to the interrogatories but he obstinately refused to do so.

## CONCLUSION

We **AFFIRM** the district court's orders striking Porcelli's claim and granting the government default judgment of forfeiture.

BRESS, Circuit Judge, dissenting:

This may seem like a technical case about discovery responses, but it portends a significant and ill-founded change in the way civil asset forfeiture proceedings will be conducted. The government wants to have a large amount of cash forfeited because it was allegedly connected to criminal wrongdoing. The person who possessed the cash when it was seized was not charged with a crime, and he claims he owns the money. He also filed a motion to suppress the evidence, claiming the search of his vehicle was unlawful. From here, what should have happened is that if the claimant has standing to claim the money, the district court would determine if the government's search complied with the Fourth Amendment. If so, or if the government had independent evidence outside of an unlawful search, the government could retain the money by meeting its burden to show that the property was connected to criminal activity. *See* 18 U.S.C. § 983(c)(1).

Instead, the government succeeds in having the claimant's entire claim thrown out through an up-front case-ending discovery sanction based on the claimant's purported failure to serve more complete responses to interrogatories unique to civil forfeiture cases. *See* Fed. R. Civ. P. Supplemental Rule G(6). The government wins by default based on a supposed discovery violation, before the case can even get going. This is a serious overextension of the so-called Supplemental Rule G(6) interrogatory device for civil forfeiture cases. And it is a blueprint for allowing the government to take money and keep it, however problematic its search tactics.

Although the claimant here has his own misunderstandings of the governing processes, he

sufficiently responded to the Rule G(6) interrogatories about his standing, at least enough to avoid the total dismissal of his claim at the very beginning of the case. The majority's contrary conclusion depends on the large amount of money found in the claimant's vehicle, but critically, that money would be inadmissible in the forfeiture proceeding if the claimant's never ruled-on motion to suppress had been granted. The majority therefore validates an extremely troubling government strategy that allows the government to use the fruits of a potentially illegal search to set up a supposed discovery violation, while dodging any judicial inquiry into the search itself.

The prospect of government abuse here is real. Through its short-circuiting of the proper processes, the majority's ratification of the government's approach contravenes our precedents, improperly shifts the statutory burden of proof, and allows the government to avoid important Fourth Amendment inquiries into its searches and seizures. The rules of civil forfeiture should weed out false claims, protect people with valid ones, and deter unlawful searches and seizures. The majority is instead incentivizing the government to turn every civil forfeiture action into an early one-sided discovery dispute that the government will nearly always win, backed by the results of law enforcement searches that, by design, will escape review under the Fourth Amendment. Today's decision unfortunately encourages the government to conduct searches however it pleases, only to be able to retain what it finds through an unprecedented and ever-ready discovery sanction that the majority inadvisedly blesses.

Because the majority opinion and district court decision reflect a misunderstanding of the civil forfeiture process and

create undue risks of government overreach, I respectfully dissent.

# I

## A.  Background on Civil Forfeiture

I begin with an overview of the rules governing civil forfeiture, because it is important to see how all the pieces fit together to understand why the majority improperly allows the government to prevail.

Under federal law, various types of property are "subject to forfeiture to the United States and no property right shall exist in them."  21 U.S.C. § 881(a).  Included as forfeitable property is money "furnished or intended to be furnished by any person in exchange for a controlled substance," as well as "all proceeds traceable to such an exchange."  *Id.* § 881(a)(6); *see also* 18 U.S.C. § 981(a)(1)(A), (C).  The government may pursue criminal forfeiture in the case of a person convicted of a criminal offense.  *See id.* § 982.  The government may also pursue civil forfeiture through an in rem proceeding against the property itself.  *See id.* § 983.  That explains the case caption in this appeal, *United States v. $1,106,775.00 in U.S. Currency*, and the many cases cited throughout this dissent, in which the United States is nominally suing some amount of money or other seized property.

We deal here with civil forfeiture.  Many have questioned whether modern civil forfeiture practices comport with due process.  *See Culley v. Marshall*, 601 U.S. 377, 393–403 (2024) (Gorsuch, J., joined by Thomas, J., concurring); *id.* at 405, 415 (Sotomayor, J., joined by Kagan and Jackson, JJ., dissenting); *Leonard v. Texas*, 137 S. Ct. 847, 848–49 (2017) (statement of Thomas, J., respecting

denial of certiorari). The claimant in this case does not advance such a broader challenge to the civil forfeiture apparatus. But the questions that have been raised about prevailing civil forfeiture practices underscore the importance of adhering to the rules that govern them.

To pursue property for civil forfeiture, the government first files a complaint in district court. 18 U.S.C. § 983(a)(3)(A). Civil forfeiture actions are subject to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (hereafter, "Supplemental Rules"). These are a set of additional procedural rules found in a supplement to the Federal Rules of Civil Procedure. *See id.* § 983(a)(3)(A), (4)(A). The Federal Rules of Civil Procedure also apply to civil forfeiture actions, "except to the extent that they are inconsistent with these Supplemental Rules." Supp. R. A(2), G(1).

Supplemental Rule G governs forfeiture actions in rem. Under Supplemental Rule G(2), the government's case-initiating complaint must, among other things, identify the property to be forfeited and provide "detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." By statute and the Supplemental Rules, the government must provide public notice of the action, as well as notice to known potential claimants. Supp. R. G(4); 18 U.S.C. § 983(a). Someone who claims the property, known as the claimant, may intervene to assert an interest in the property. Supp. R. G(5); 18 U.S.C. § 983(a)(4)(A). Among other things, this claim must "identify the specific property claimed" and "identify the claimant and state the claimant's interest in the property." Supp. R. G(5)(a)(i)(A), (B).

Highly pertinent to this case, if a claimant intervenes and asserts an interest in the property, Supplemental Rule G(6) allows the government to serve early special interrogatories on him. Under this Rule, "[t]he government may serve special interrogatories limited to the claimant's identity and relationship to the defendant property without the court's leave at any time after the claim is filed and before discovery is closed." Supp. R. G(6)(a). We have explained that "[t]he purpose of [Supplemental Rule G(6)] is 'to permit the government to file limited interrogatories at any time after a claim is filed to gather information that bears on the claimant's standing.'" *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 635 (9th Cir. 2012) (quoting Supp. R. G advisory committee's note (subdivision (6)). I will have more to say about standing and Rule G(6) interrogatories below.

Supplemental Rule G also provides special rules for motions practice. Importantly, the Fourth Amendment's exclusionary rule applies to civil forfeiture proceedings. *See, e.g.*, *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 949 (9th Cir. 2010) (citing *One 1958 Plymouth Sedan v. Pennsylvania*, 389 U.S. 693, 696 (1965)); *United States v. $493,850.00*, 518 F.3d 1159, 1164 (9th Cir. 2008). Supplemental Rule G(8)(a) therefore provides that "[i]f the defendant property was seized, a party with standing to contest the lawfulness of the seizure may move to suppress use of the property as evidence."

Thus, if you have standing, you can go to court and claim the seized property. And if you have "standing to contest the lawfulness of the seizure," Supp. R. G(8)(a), you can

challenge the seizure as well.[1]  If the government violated the Fourth Amendment, the evidence from the search—including the seized property itself—is inadmissible in the forfeiture proceeding.  *See United States v. $191,910.00*, 16 F.3d 1051, 1062–63 (9th Cir. 1994) ("[W]e must hold that the district court was correct in excluding the illegally-seized money."), *superseded by statute on another ground as stated in United States v. $80,180.00*, 303 F.3d 1182, 1184 (9th Cir. 2002); *see also $493,850.00*, 518 F.3d at 1165 ("[W]e cannot consider the amount of currency that the government illegally seized.").  If the search is improper a court could still consider "the nature of *res*" seized, but nothing more. *$493,850.00*, 518 F.3d at 1170.  Thus in the case of money, courts may "recognize[] the nature of the illegally seized property as currency," but may not "consider its amount." *Id.* at 1165; *see also id.* ("To the extent [the judge] considered the amount of currency, we agree that such consideration was improper.").

We have recognized that the Fourth Amendment's protections are essential in preventing government abuse of the civil forfeiture process.  "Applying the exclusionary rule in forfeiture proceedings . . . protects judicial integrity by

---

[1] Supplemental Rule G thus uses "standing" in two distinct senses.  The first is standing to claim the property.  Supp. R. G(8)(b), (c), advisory committee's note (subdivision 6)).  The second is standing to contest the lawfulness of the seizure.  Supp. R. G(8)(a).  As the Advisory Committee Notes explain, "[s]tanding to suppress use of seized property as evidence is governed by principles distinct from the principles that govern claim standing."  Supp. R. G advisory committee's note (subdivision (8)).  That is, to challenge the seizure one must also have Fourth Amendment standing.  So if someone claims ownership in the seized property, but the property was not seized from him, he may not be able to challenge the seizure.  *See id.* ("A claimant with standing to contest forfeiture may not have standing to seek suppression.").

ensuring that the courts do not serve as a conduit through which the government fills its coffers at the expense of those whose constitutional rights its agents violated." *$186,416.00*, 590 F.3d at 950. Indeed, we have recognized that "application of the exclusionary sanction in these cases is likely to prove especially effective in deterring law enforcement agents from engaging in illegal activity" because of "the government's strong financial incentive to prevail in civil forfeiture actions." *Id.* Not applying the exclusionary rule in civil forfeiture cases, by contrast, "would merely reward the government for carrying out an illegal search or seizure." *$493,850.00*, 518 F.3d at 1165.

What all of this means is that if the government loses a motion to suppress and has no independent, untainted evidence beyond that gleaned from the illegal search or seizure, the government is not going to be able to meet its burden to establish forfeitability. *See, e.g.*, *$186,416.00*, 590 F.3d at 945–46 ("We conclude that the evidence relied upon by the District Court was itself tainted by the illegal search and should be suppressed, and that without the suppressed evidence the government lacked probable cause to connect the defendant currency to a violation of federal law."); *$191,910.00*, 16 F.3d at 1071 ("Having determined that the district court correctly decided the suppression issues, we have little difficulty in holding that the district court was also correct in concluding that the government failed to establish probable cause [to institute the civil forfeiture action]," and affirming summary judgment for the claimant); *see also, e.g.*, *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017), *as amended*, 870 F.3d 963 (9th Cir. 2017); *United States v. Real Prop. Known As 22249 Dolorosa St., Woodland Hills, Cal.*, 167 F.3d 509, 513 (9th Cir. 1999).

Turning back to Supplemental Rule G, that Rule also gives the government some specialized motions of its own. Specifically, "[a]t any time before trial, the government may move to strike a claim or answer: (A) for failing to comply with Rule G(5) or (6), or (B) because the claimant lacks standing." Supp. R. G(8)(c).  The first part of this provision, which mentions Rules G(5) and (6), is a reference to the requirements for making out the claim itself (Rule G(5)) and to the claimant's responses to the limited interrogatories (Rule G(6)).  The Supplemental Rules further provide that if the government files a motion to strike a claim or answer under Rule G(8), such a motion "must be decided before any motion by the claimant to dismiss the action."  Supp. R. G(8)(c)(ii)(A).  Further, such a motion by the government "may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supp. R. G(8)(c)(ii)(B).  Thus, the government can file motions directed at the claimant's standing and for his non-compliance with the Rule G procedural requirements.

Important questions can arise in civil forfeiture cases about the proper sequencing of the various motions. Claimants may prefer to litigate their motions to suppress first.  The government, by contrast, will often prefer to litigate the claimant's standing before anything else.  Some courts have said that resolution of questions of standing should precede resolution of any motion to suppress, although as we will see, these cases do not govern here because what it means to have "standing" in this context is itself a nuanced question. *See, e.g.*, *United States v. $39,000*, 951 F.3d 740, 742 (6th Cir. 2020) ("Before determining whether the government lawfully seized the defendant

property, Wells must establish that he has standing to challenge the lawfulness of seizure."); *United States v. $133,420.00*, 2010 WL 1433427, at *3 (D. Ariz. Apr. 9, 2010) (citing cases and noting that "courts have required claimants to establish Article III standing as a prerequisite to bringing a motion to suppress in a forfeiture proceeding"). Sequencing standing first can make sense because if the claimant lacks a legally cognizable claim to the seized property, there is little point in litigating further. But as I explain below, if resolution of the claimant's "standing" turns on evidence from an allegedly illegal search, the motion to suppress will need to be resolved first, otherwise the government would profit from evidence that may have been illegally obtained. Of note, standing in civil forfeiture cases is a question of law for the district court to decide. *See* Supp. R. G advisory committee's note (subdivision (8)); *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 646 (7th Cir. 2015).

For its part, the government can forfeit the property by showing it is connected to criminal wrongdoing. Importantly, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). Placing the burden of proof on the government reflects a significant change to the civil forfeiture rules, made in the Civil Asset Forfeiture Reform Act of 2000 (CAFRA). The change followed "widespread criticism" of the earlier rule, under which the claimant had to prove that the property was not subject to forfeiture. *United States v. $80,180.00 in Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002); *see also United States v. Real Property in Section 9*, 241 F.3d 796, 799 (6th Cir. 2001) (describing how CAFRA "corrects a

provision in the law that had been criticized repeatedly by the courts and legal commentators").

If the matter proceeds to summary judgment, whether on a government theory that the claimant lacks standing or on the ground that the property is subject to forfeiture, a motion to suppress may be implicated, to the extent the district court has yet to rule on it. "[A] district court's ruling on a motion for summary judgment may only be based on admissible evidence." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010). Thus, if the government seeks to rely on evidence obtained from a search and seizure, the district court could not rely on that evidence without first resolving the claimant's motion to suppress it. *See* Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 3-7 (2d ed. 2013) (citing *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 (11th Cir. 2004)). From here, if there is a genuine dispute of material fact over forfeitability, the case would proceed to trial, with the government bearing the burden of proof. *See United States v. JP Morgan Chase Bank Acct. No. Ending 8215*, 835 F.3d 1159, 1166 (9th Cir. 2016).

## B. Facts and Procedural History

During a traffic stop on Interstate 80 outside of Reno, Nevada on November 19, 2019, officers discovered $1,106,775.00 in Oak Porcelli's vehicle. That is a lot of cash to have in one's vehicle. If the government was properly put to its burden of proof, one can imagine the government meeting it—assuming the evidence is admissible. But although the majority opinion treats everything found in the search as fair game in its analysis, including statements Porcelli made during the stop, it is important to recognize that all of this evidence is the subject of Porcelli's motion to

suppress, which the district court never ruled on. In assessing the system-wide risks that the majority opinion creates, it is worth appreciating that the circumstances of Porcelli's stop and its prolonged nature raise legitimate Fourth Amendment questions. And because of the majority's opinion, these questions will never be answered.

Porcelli was driving across Nevada in a rented Chevy Tahoe bearing Florida license plates. After following Porcelli for some time, a highway patrol officer who was part of a drug task force pulled Porcelli over for allegedly driving too close to another vehicle, which Porcelli denies he was doing. The officer obtained Porcelli's license and that of his passenger, Gina Pennock, and claimed that he smelled the odor of marijuana emanating from the Tahoe. At that point, the officer ordered Porcelli to step out of the vehicle.

The officer then questioned Porcelli for "multiple minutes" about his travel plans and itinerary. Eventually a backup highway patrol officer arrived (it appears the first officer called for backup before the stop, evidently already planning for what would happen next). As the backup officer began to conduct a warrants check, the first officer "continued to engage Porcelli in conversation." After a third officer arrived, the lead officer questioned Pennock about her travel plans and then "reengaged Porcelli in conversation," asking for the first time if the vehicle contained "weapons, humans, drugs, [or] illicit currency." Eventually, based on the lead officer's suspicions, a backup officer deployed his canine, which allegedly alerted to the odor of drugs. This led the officers to search the vehicle, where they found the cash at issue.

There is no indication that Porcelli was charged with any crimes.  Instead, on March 10, 2020, the government filed a complaint seeking civil forfeiture of the money based on its claimed connection to drug crimes.  Porcelli filed a verified claim to the currency on April 30, 2020, and an answer thereafter.  In his verified claim, Porcelli stated that he owned all the money.

Porcelli also moved to suppress the evidence from the search—including the cash itself and his statements to the officers—as obtained in violation of the Fourth Amendment. Porcelli argued, among other things, that the officer's stop of Porcelli for driving too closely behind another vehicle was without basis and a pretext for investigating criminal activity.  Porcelli also maintained that the officers' stop was unreasonably prolonged and exceeded the mission of addressing the traffic violation that warranted the stop. *See Rodriguez v. United States*, 575 U.S. 348, 350 (2015) ("We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.").

The government responded by serving a set of special interrogatories on Porcelli under Supplemental Rule G(6). These interrogatories asked Porcelli various questions about the currency, including how he obtained it, bank accounts through which the money passed, and businesses with which he was affiliated.  Porcelli provided an initial round of responses and issued his own discovery requests to the government.  A magistrate judge granted the government's motion to compel Porcelli to respond further to the Rule G(6) interrogatories.   The magistrate judge also granted the government's motion to stay Porcelli's request for discovery and to stay proceedings on Porcelli's motion to suppress.

From this point on, the entire case became solely about Porcelli's Rule G(6) interrogatory responses.

The district court rejected Porcelli's objections to the magistrate judge's ruling. The district court explained that the government was "seeking information regarding Claimants' standing," and it declined to upset the magistrate judge's ruling, "[r]ecognizing that standing remains a threshold issue in this forfeiture action." According to the district court, "[d]etermining whether Claimants have standing is the first and most critical question in this action," and Porcelli's interrogatory responses were "hinder[ing] [the government's] ability to gather information on Porcelli's standing."[2]

In response to the court's order, Porcelli served further responses to the Rule G(6) interrogatories. Some of the government's interrogatories exceeded the scope of Rule G(6), and Porcelli properly objected to them. Even so, Porcelli amended his responses to provide substantial additional information. In response to a request to describe "the nature and extent" of his interest in the property, Porcelli responded that "I own all of the Defendant currency seized from the vehicle I rented and had just been driving, and consequently I had and have a right to possess it and otherwise exercise dominion and control over it."

In response to an interrogatory requesting that he describe how he acquired his interest in the property, Porcelli explained that he "earned my money (that was seized from me and is now Defendant in this case) by working in the

---

[2] The district court referred to "Claimants" because in the court below, Porcelli's passenger, Pennock, was also a claimant. But Pennock later withdrew her claim, and she is not a party to this appeal.

movie industry for 15 years, from ~ 1995–2010, and saving it." Porcelli identified positions he held and movie companies with which he was affiliated and that were his sources of funding, describing how "[s]ome of the money was acquired as cash initially, usually for the smaller projects, and some was initially checks or direct deposits or wire transfers or the like into my business account." According to Porcelli, his earnings "would be budgeted out as one of the costs of production." He also included a link to his IMDB page listing his past film projects.

In addition, in response to an interrogatory asking him to describe relevant documents, Porcelli identified "[m]y tax returns and supporting documents from those years, as well as wire transfer receipts, contracts, and budgets for film projects showing my earnings, most of which would have to be obtained from old hard drives and perhaps my accountant's files." He also identified records held at Chase Bank for his business account for the entity Light Wave Entertainment, adding that "[m]uch of the money originated as cash and never went into a bank or financial institution account, but any that did would have gone through Chase Bank." Porcelli listed his bank account number for his business.

Maintaining that Porcelli's interrogatory responses were still insufficient, the government filed a motion to strike his claim to the seized funds. The district court agreed with the government that the interrogatory responses were still insufficient. Porcelli declined to amend his responses further. The government then filed a further motion to strike Porcelli's claim, which the district court granted as a discovery sanction. The court reiterated that the point of Rule G(6) was to allow the government to file limited interrogatories that bear on the claimant's standing, and

Porcelli's evasive responses had hindered the judicial process on that issue.

The case therefore ended in a discovery violation, with no further proceedings on Porcelli's standing, his motion to suppress, or the forfeitability of the property.

## II

The question before us is whether the district court had a proper basis for pulling the plug on this case in the way that it did. It is true that we usually give district courts latitude when it comes to discovery issues. But here we are talking about a case-ending sanction. And a short-circuiting of the proper processes not only is error as a matter of law but raises broader concerns about whether civil forfeiture will function as intended for all participants in the process—including those with valid claims and those whose homes and property the government has unlawfully searched and seized.

In my view, it was error for the district court to end this case how it did, and the majority's approval of the government's unprecedented strategy creates grave risks that the government will abuse the civil forfeiture system going forward. By the logic of the majority opinion, the government can avoid any Fourth Amendment inquiry into the legality of its own searches—even when the claimant has a reasonable expectation of privacy in the place searched—by forcing the claimant into a one-sided Rule G(6) discovery battle that the claimant can almost never win unless he shows his claim is legitimate. But that is contrary to the civil forfeiture statute, which places the burden of proof on the government. And it only rewards the government for what may be improper search and seizure tactics.

We need look no further than this case to see the likely fallout, as the government is simultaneously using the fruits of its challenged search to force Porcelli into a case-dispositive discovery violation, while avoiding any Fourth Amendment inquiry into the law enforcement officers' own conduct in locating the cash. The majority's decision to allow this misuse of the Rule G(6) interrogatories is inconsistent our precedents and strips claimants of the important protections that the Fourth Amendment and Rule G(6) provide.

### A. Claimant Standing in Civil Forfeiture Cases

A great deal of confusion in this area of law arises from (1) the requirement that the claimant have standing, and (2) the role of Rule G(6) interrogatories in probing the basis for that asserted standing. How does the legal requirement of standing interact with the Rule G(6) discovery obligation? And how is the Rule G(6) discovery obligation supposed to operate in conjunction with a claimant's motion to suppress the evidence from the search? Some review of the law is required to unpack these different points.

In civil forfeiture proceedings, a person who intervenes and claims an interest in the subject property must have Article III standing, just like any other person who comes to court asking for relief. *See $133,420.00*, 672 F.3d at 637. We have said that claimants in civil forfeiture cases can establish the elements of standing by "showing that they have a 'colorable interest in the property,' which includes an ownership interest or a possessory interest." *Id.* (quoting *United States v. 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004)) (citation omitted). Through those showings, "Article III's standing requirement is thereby satisfied because an owner or possessor of property that has

been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property." *Id.* at 638 (quoting *United States v. $515,060.42*, 152 F.3d 491, 497 (6th Cir. 1998)).

"Standing" may be an inexact word here. Some have observed that the use of the term is "unfortunate because striking a claim is a decision on the merits. It is not a determination that the claimant has failed to show that the court has jurisdiction. . . . [I]t is a determination that he has no interest in the property." *United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 653 (7th Cir. 2013). What we are really asking here is whether someone who comes to court claiming the seized property has a sufficiently supported and legally recognized interest in it.

What is required for a claimant to demonstrate standing in a civil forfeiture case depends on the stage of the proceedings and the nature of the claimed property interest. That is, "elements of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.' This rule applies equally in civil forfeiture proceedings." *$133,420.00*, 672 F.3d at 638 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *see also JP Morgan Chase*, 835 F.3d at 1164 (same). There are different types of claimed legal interests in property, but the two most relevant in these types of cases are ownership and possessory interests.

For ownership claims, we have been clear that "[a]t the motion to dismiss stage, a claimant's unequivocal assertion of an ownership interest in the property is sufficient by itself to establish standing." *United States v. $999,830.00 in U.S.*

*Currency*, 704 F.3d 1042, 1042–43 (9th Cir. 2012) (per curiam) (quoting *$133,420.00*, 672 F.3d at 638); *see also $191,910.00*, 16 F.3d at 1057. Possessory interests are different. At the motion to dismiss stage, a claimant asserting a possessory interest "must offer some 'factual allegations regarding how the claimant came to possess the property, the nature of the claimant's relationship to the property, and/or the story behind the claimant's control of the property.'" *$133,420.00*, 672 F.3d at 638 (quoting *$515,060.42*, 152 F.3d at 498).

We have also addressed the required showings at summary judgment. At that stage, unlike at a motion to dismiss, "a claimant's bare assertion of an ownership or possessory interest, in the absence of some other evidence, is not enough to survive a motion for summary judgment." *Id.* Thus, "[a] claimant asserting an ownership interest in the defendant property . . . must also present 'some evidence of ownership' beyond the mere assertion in order to survive a motion for summary judgment." *Id.* at 639 (quoting *United States v. $81,000.00*, 189 F.3d 28, 35 (1st Cir. 1999)).

So what counts as "some evidence" of standing at summary judgment? For possessory interest claims, it is evidence of how the claimant came to possess the property. *See id.* But for ownership claims, we have said that "[t]he fact that property was seized from the claimant's possession, for example, may be sufficient evidence, when coupled with a claim of ownership, to establish standing at the summary judgment stage." *Id.* The claimant in *$133,420.00* disclosed the following in his Rule G(6) interrogatory response: "[M]y interest in the defendant property is as the owner and possessor of said property, with a right to exercise dominion and control over said property." *Id.* at 637. Not unlike Porcelli here, Louis, the claimant in *$133,420.00*, was

stopped on an interstate highway and suspiciously found with a large amount of cash in his car. *Id.* at 636. But we made clear that Louis's unequivocal assertion of ownership plus his possession of the cash would have been sufficient to show standing at summary judgment: "That assertion of ownership, combined with Louis's possession of the currency at the time it was seized, would be enough to establish Louis's standing for purposes of a motion for summary judgment." *Id.* at 640; *see also $191,910.00*, 16 F.3d at 1057–58 (similar).

Decisions from other circuits at the summary judgment stage are in accord. For example, the Seventh Circuit has held that "an assertion of ownership combined with some evidence of ownership"—such as "possession of the currency when it was seized"—"is sufficient to establish standing at the summary judgment stage of a civil forfeiture action." *$239,400*, 795 F.3d at 642–43. In *$239,400*, the claimant, Valdes, was found carrying $239,400 in cash at a train station. *Id.* at 640. The Seventh Circuit held that because "Valdes asserted in sworn responses to the special interrogatories that he is the owner of the defendant currency and that it was in his possession when it was seized," "[f]ollowing the Ninth and Tenth Circuits, this is sufficient evidence for a claimant to establish standing at summary judgment." *Id.* 643 (citing *$133,420.00*, 672 F.3d at 640); *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1276 (10th Cir. 2008)).

The cases have also recognized that the required showing at summary judgment has implications for the burden of proof, in that the showing of standing at summary judgment cannot be set so high that it flips the burden of proof. In *$239,400*, the government argued that at summary judgment, the claimant had to demonstrate "legitimate"

ownership of the money to show standing. *Id.* at 642. The Seventh Circuit rejected this because it improperly "blend[s] standing and the merits." *Id.* at 640. According to the Seventh Circuit, showing "legitimate" ownership "is tantamount to demonstrating that 'property is not subject to forfeiture.'" *Id.* at 646 (quoting *United States v. $125,938.62*, 537 F.3d 1287, 1293 (11th Cir. 2008)). If we were to require the claimant to show "legitimate" ownership at summary judgment, that would "nullify a central reform of CAFRA" by "effectively shift[ing] the burden of proof from the government back to the claimant, contrary to 18 U.S.C. § 983(c)." *Id.* at 646. And if it were up to the claimant to prove "legitimate" ownership, "[t]he government would rarely be put to its proof in a civil forfeiture action unless it elected not to file a summary judgment motion challenging standing." *Id.*

The D.C. Circuit has made a similar point, explaining that when "a claimant's account of ownership is irreconcilable with the theory upon which the government seeks forfeiture, requiring the claimant to produce more than 'some evidence' of ownership runs the danger of impermissibly shifting the merits burden to the claimant— tantamount to, say, making a claimant prove that her property is *unconnected* to unlawful activity." *United States v. $17,900 in U.S. Currency*, 859 F.3d 1085, 1091 (D.C. Cir. 2017). And we have said the same in the case of possessory interests, explaining that "[b]y 'lawful possessory interest,' we do not mean that a claimant must prove that his possession is lawful, which is an inquiry better left for the merits of an asset-forfeiture action." *JP Morgan Chase*, 835 F.3d at 1166 n.7.

## B.  Contesting a Claimant's Standing

Porcelli sees all this case law and argues that between his unequivocal assertion that he owns the money and the fact that he possessed it when seized, he has shown standing, and so requiring him to say anything more in his Rule G(6) interrogatory responses was error.  Porcelli overstates his case in claiming that he could never be required to say more about how he came to possess the money.  But the pendency of a motion to suppress does place some inevitable limits on what Rule G(6) can accomplish before the Fourth Amendment issues are decided.

As an initial matter, Porcelli is correct that he has established standing at this juncture.  Recall that this case never even reached the point of Rule 12(b)(6) motions practice.  But at that stage, an "unequivocal assertion of an ownership interest in the property is sufficient by itself to establish standing." *$999,830.00*, 704 F.3d at 1042–43 (quoting *$133,420.00*, 672 F.3d at 638).  So Porcelli would have survived a motion to dismiss on standing grounds, and the district court erred to the extent it struck Porcelli's claim because it believed Porcelli had not sufficiently established standing at this point in the proceedings.

Porcelli also argues that what he has come forward with on standing would survive summary judgment, because his assertion of ownership "combined with [his] possession of the currency at the time it was seized, would be enough to establish [his] standing for purposes of a motion for summary judgment." *$133,420.00*, 672 F.3d at 640; *see also $239,400*, 795 F.3d at 644–46; *$148,840.00*, 521 F.3d at 1274–77.  Once again, Porcelli is correct, so far as it goes. If the government had moved for summary judgment now, it should have lost.  Any summary judgment motion on

standing at this juncture would necessarily depend on the argument that Porcelli has not shown *legitimate* ownership in the money. But Porcelli does not bear that burden of proof. *See* 18 U.S.C. § 983(c)(1); *$17,900.00*, 859 F.3d at 1091; *$239,400*, 795 F.3d at 644.

Where Porcelli errs, however, is in assuming that his assertions of ownership once made cannot be challenged through the discovery process. Evidently aware of the case law rejecting government motions to dismiss and motions for summary judgment for claimants' asserted lack of standing, the government wants to avoid that result by proving that Porcelli's claim of ownership to the money is false. If the cash is not Porcelli's own money, then he is presumably possessing it for someone else, in which case to have standing he would have to say more about the circumstances of how he has come to possess it for another. *See $133,420.00*, 672 F.3d at 638–39. The Supplemental Rules themselves provide that "[a] claim filed by a person asserting an interest as a bailee must identify the bailor, and if filed on the bailor's behalf must state the authority to do so." Supp. R. G(5)(a)(iii). Effectively, the government believes Porcelli is lying when he claims to own the money, and that in fact he was likely transporting the money for someone else but does not want to disclose that.

When the cases say that an unequivocal assertion of ownership plus possession of the property when seized is sufficient to show standing at summary judgment, *see $133,420.00*, 672 F.3d at 638, they mean that if this is all the record shows, there is standing at summary judgment. They do not mean that an assertion of ownership cannot be investigated through discovery and proven wrong. This is where the Rule G(6) interrogatories come in. They are one of the tools available to the government to disprove

claimants' allegations of standing. And they are a useful tool in that the government can serve these interrogatories at any time, without leave of court. *See* Supp. R. G(6)(a).

Our decision in *$133,420.00* shows that Porcelli is wrong in claiming that if he presently has standing (he does), he for that reason does not need to respond to Rule G(6) interrogatories about standing. In *$133,420.00*, the claimant argued that because he could "establish standing merely by asserting an interest in the property, and because the advisory committee's note to Supplemental Rule G(6) limits the interrogatories to questions 'bearing on a claimant's standing,' it follows that Rule G(6) allows only questions regarding the identity of the claimant and the type of legal interest asserted." 672 F.3d at 642. In the claimant's view, Rule G(6) "d[id] not allow the government to pose any questions about the circumstances in which the claimant obtained an interest in the property." *Id.*

We disagreed because Rule G(6) "broadly allows the government to collect information regarding the claimant's 'relationship to the defendant property.'" *Id.* (quoting Supp. R. G(6)(a)). Although we discussed some of the additional information the government could seek in the case of claimed possessory interests, *see id.*, Porcelli is wrong that *$133,420.00* does not extend to claimed ownership interests. Instead, we emphasized that the claimant's narrow construction of Rule G(6) was untenable because it would make the requirements of Rule G(6) coextensive with what is already required for the claim itself under Rule G(5). *Id.* at 643 (explaining that the claimant's "limited interpretation would make Supplemental Rule G(6)(a) superfluous").

Thus, if a claimant asserts an ownership interest, the government can still probe "the veracity of his claim of

ownership," *id.* at 642, through Rule G(6) interrogatories (as well as through the other discovery devices available in civil litigation). Porcelli's unequivocal assertion of ownership and the fact that he possessed the money when seized are sufficient to establish standing *if* the government does not press further. *See id.* at 640. But the government can test these assertions through the discovery process and build a record to show that the claimant lacks standing. *See also United States v. Real Prop. Located at 17 Coon Creek Rd.*, 787 F.3d 968, 978 n.4 (9th Cir. 2015) (noting that the government is "entitle[d] to 'adversarial testing' of [the claimant's] continued standing"); *$574,840*, 719 F.3d at 652 ("It is always open to a party to contest standing by proving facts that contradict his opponent's allegations of standing."). In fact, the key interrogatory that the government served on Porcelli asking him how he acquired his interest in the property is very similar to the interrogatory in *$133,420.00* that we said was "well within the scope" of Rule G(6). 672 F.3d at 643 n.5.

In short, even if Porcelli came forward with enough at the relevant stage of the proceeding to establish standing, the government need not accept Porcelli's assertions of ownership at face value. The Rule G(6) interrogatories provide the government with one way to test Porcelli's position on standing. But as we will see, how much Porcelli is required to say before a ruling on his motion to suppress is a critical issue.

### C. Assessing the Sufficiency of Rule G(6) Interrogatory Responses

I now turn to the important question of how much a claimant needs to say in response to Rule G(6) interrogatories to avoid what happened here, which was the

district court striking the entire claim as a discovery sanction. I will lay out what I think are the three options for consideration, which are all based on the assumption that no motion to suppress is pending. I will then lay out an important caveat that flows from the Fourth Amendment.

The first option is Porcelli's strong-form position that once a claimant unequivocally asserts ownership in the property, if that property was in his possession when seized, then the government cannot make any further inquiries through Rule G(6) interrogatories. I have already explained why this position is irreconcilable with both our precedent, Rule G(6), and basic logic. In a companion case that we decide today by memorandum disposition, *United States v. $204,700 in U.S. Currency*, No. 22-16661, the claimant, Ms. Henry, also had her claim stricken as a discovery sanction based on her responses to the Rule G(6) interrogatories. But unlike Porcelli, Henry responded solely by reiterating that she "has repeatedly stated under oath that she owns the property which the Government admits that it seized from her so she has established Article III . . . standing." Setting aside any Fourth Amendment issues with the search in Henry's case, I agree that her responses were insufficient and that her claim could be stricken based on her repeated failure to respond to court orders requiring more substantial interrogatory responses.[3]

On the opposite extreme, the second option for the required depth of a claimant's Rule G(6) interrogatory responses would be that the claimant must come forward

---

[3] Because of the previous lack of clarity in the law in this area and the fact that the sufficiency of Henry's responses must be evaluated alongside her unresolved motion to suppress, a point I discuss below, Henry's claim should also be remanded for further proceedings.

with responsive information demonstrating his *legitimate* ownership of the property.   To the extent this is the government's position, and to the extent it is the position the district court vindicated, it is unsound.  As I discussed above, in the summary judgment context courts have been sensitive to the idea that requiring a claimant to prove his legitimate ownership of seized property would flip CAFRA's burden of proof, which the statute importantly assigns to the government.  *See $239,400*, 795 F.3d at 642–43.  At some point, requiring claimants right out of the gate to provide excruciating detail in Rule G(6) interrogatory responses about their ownership of seized currency would risk the same improper burden-shifting.

The third option, and the one I favor, is that the claimant must come forward with a reasonable amount of information to allow the government to conduct further discovery into the claimant's standing.   That middle ground approach strikes the right balance for several reasons.  It is most consistent with CAFRA placing the ultimate burden of showing forfeitability on the government.  It is also most consistent with Supplemental Rule G(6), a focused discovery tool that is meant to allow the government to serve only "limited interrogatories" for obtaining "information that bears on the claimant's standing."  Supp. R. G advisory committee's note (subdivision (6)).  My approach is likewise most consistent with the notion that dismissal for a discovery violation is proper only in "extreme circumstances."  *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996) (quoting *United States v. Kahaluu Const.*, 857 F.2d 600, 603 (9th Cir. 1988)).  As the Advisory Committee notes to Rule G(8) instruct, "[n]ot every failure to respond to subdivision (6) interrogatories warrants an order striking the claim."  *See also 17 Coon Creek Rd.*, 787 F.3d at 976 n.2 (explaining that

Rule G(8) "does not compel the court to grant the motion upon finding non-compliance with Rule G(6)").

A final reason that supports my middle-ground approach, which is particularly relevant in asset forfeiture cases like this one, is that it can be quite difficult to account for the circumstances by which one obtained cash. As the D.C. Circuit has explained "the very qualities that make paper money useful for illicit activity—in particular, its untraceability—often make it difficult to prove that any cash is legitimate, no matter its source." *$17,900.00*, 859 F.3d at 1090. This creates particular problems for "the poor and other groups least able to defend their interests in forfeiture proceedings" who "are more likely to use cash than alternative forms of payment." *Leonard*, 137 S. Ct. at 848 (statement of Thomas, J.). And, unfortunately, there is reason to be concerned that government forfeiture operations may disproportionately target these groups. *See id.*; *Culley*, 601 U.S. at 396–97 (Gorsuch, J., concurring).

I appreciate that Porcelli, who was found with over $1 million in cash, may not be among society's most vulnerable, especially if he is correct that he owns the money. But the reality remains that "especially when cash is at issue, requiring more than 'some evidence' of ownership would be onerous, unfair, and unrealistic." *$17,900.00*, 859 F.3d at 1091. And the rules should be interpreted in a way that accounts for, and provides protections against, the possibility of government misuse of the civil forfeiture process, hardly an imaginary concern. That is especially so when the effect of imposing more robust burdens of production on claimants' standing—on pain of them losing their claims entirely—is that the government avoids having to meet its burden of proof. *See* 18 U.S.C. § 983(c)(1).

In this sense, my approach to the Rule G(6) interrogatories is very much in keeping with the arc of the precedents in this area, which have repeatedly rejected the government's efforts to use procedural devices to shut down civil forfeiture claims prematurely. Courts rejected the government's attempts to require that claimants make a greater showing of standing at the motion to dismiss and summary judgment stages. *See, e.g.*, *$999,830.00*, 704 F.3d at 1043; *$148,840.00*, 521 F.3d at 1274–77; *$17,900.00*, 859 F.3d at 1090–92; *$239,400*, 795 F.3d at 644–46; *$133,420.00*, 672 F.3d at 638, 640. Courts likewise rejected the government's attempts to require claimants to assert in their Rule G(5) claims "any explanation or contextual information" about the claimant's ownership to the seized currency, because this too "would turn the burden of proof in forfeiture actions on its head." *United States v. $31,000*, 872 F.3d 342, 350, 353 (6th Cir. 2017); *see also United States v. $579,475.00 in U.S. Currency*, 917 F.3d 1047, 1049 (8th Cir. 2019) (en banc); *United States v. $196,969*, 719 F.3d 644, 647 (7th Cir. 2013). In all of these cases, the government in one way or another "jumped the gun." *$574,840*, 719 F.3d at 653.

The government is jumping the gun here, too. An interpretation of Rule G(6) that requires claimants to come forward with a reasonable amount of information to allow further inquiry into standing is consistent with the above precedents, rules, and values. An interpretation that imposes on claimants the obligation to answer the entire case at the outset through supposedly limited interrogatories is not.

## D.  The Relevance of a Motion to Suppress

I noted at the outset of the preceding section an important Fourth Amendment caveat, and I return to that issue now. In

evaluating the sufficiency of Rule G(6) interrogatory responses, should it matter if the claimant is challenging the search or seizure that led to the property that is the subject of the forfeiture action?  Our decision in *$133,420.00* did not have occasion to address this issue, but the answer must be yes.

When a motion to suppress is pending, a claimant who has "standing to contest the lawfulness of the seizure," Supp. R. G(8)—*i.e.*, one who has a reasonable expectation of privacy in the area searched—cannot be penalized for Rule G(6) responses whose supposed insufficiencies depend upon information that was obtained through the allegedly unlawful search or seizure.  Why?  Because if the government cannot rely on illegally seized evidence to support its forfeiture request, *see, e.g.*, *$186,416.00*, 590 F.3d at 950; *$191,910.00*, 16 F.3d at 1071, a court likewise cannot dismiss a claim as a discovery sanction due to the claimant's failure to respond to interrogatories premised on this same claimed illegality, until the motion to suppress is resolved.  Any other result would "merely reward the government for carrying out an illegal search or seizure." *$493,850.00*, 518 F.3d at 1165.

A hypothetical may be helpful.  Imagine that law enforcement agents egregiously burst into a home and search it without probable cause, finding $1,000 in cash that they later assert is connected to drug dealing.  The government seeks civil forfeiture, and the homeowner enters the case by filing a claim and a motion to suppress the seized cash.  The government then serves Rule G(6) interrogatories asking about the circumstances by which the claimant came to own the $1,000.  If the claimant does not provide the details by which he acquired the cash, should the government be able to have the claimant's claim thrown out as a discovery

sanction before the court issues any ruling on the motion to suppress?

The answer has to be "no." Because "the amount of currency" is subject to suppression if the search was unlawful, *see $493,850.00*, 518 F.3d at 1165, penalizing the claimant with a case-ending sanction for failing to respond to an interrogatory that turns on the amount of the cash before resolution of the motion to suppress would reward the government for a potentially unlawful search. *See id.* To be sure, the claimant, before resolution of a motion to suppress, could be required to provide information *sufficient* to establish standing, such as an assertion of ownership and a representation that he possessed the money when seized. The claimant could also be required, before any ruling on a motion to suppress, to answer Rule G(6) interrogatories related to his Fourth Amendment standing, *see* Supp. R. G(8), such as questions bearing on his ownership of the home itself (because if he does not own the home, he may have no reasonable expectation of privacy to begin with). The government could also seek to contest the claimant's standing in various other ways that do not depend on the information gleaned from the potentially unlawful search.

But as a matter of logic, sanctioning the claimant with a default judgment for not describing how he specifically came to possess the $1,000 would not only risk flipping the burden of proof, it would allow the government to use Rule G(6) interrogatories premised on a potentially illegal search or seizure to improperly force early dismissals of claims. That is, the government could blatantly violate the Fourth Amendment by searching someone's home, seeing what it finds during the search, and then keeping the money or other items if the claimant cannot explain his legitimate ownership of the seized items in Rule G(6) interrogatory responses.

The same is true of property taken directly from someone's person, as in a stop and frisk.

The majority's response to this hypothetical proves this point.   It asserts that officers will be deterred from conducting illegal searches because the evidence would not be admissible in a criminal proceeding.   Maj. Op. 27 n.7. But the majority's decision eliminates those same safeguards in the civil forfeiture context, even though the Fourth Amendment's protections clearly apply there as well.   *See, e.g.*, *One 1958 Plymouth Sedan*, 389 U.S. at 696; *$186,416.00*, 590 F.3d at 949–50.   The majority opinion is effectively creating an exception to the Fourth Amendment's protections for discovery sanctions premised on inadequate Rule G(6) interrogatory responses.

The process should not work that way.   Many people possess things that they shouldn't, but we don't think the government can seize it without following the proper procedures.     Fourth   Amendment   precedents   protect unsavory people, and civil forfeiture claimants can sometimes be among them.   But our law is premised on the belief that the need to protect innocent property owners and deter government abuses of the civil forfeiture process outweigh the potential costs of requiring the government to comply with the Fourth Amendment.   The Rule G(6) interrogatories cannot be used in any different manner.

In short, in evaluating the sufficiency of Rule G(6) interrogatory responses, claimants, to avoid dismissal of their claim, must come forward with a reasonable amount of information to allow the government to conduct further discovery into the claimant's standing.   But if the claimant is challenging the search that led to the forfeited property, the sufficiency of the claimant's Rule G(6) interrogatory

responses must be evaluated with the motion to suppress in mind. In some circumstances, and to prevent the government from profiting from a potentially illegal search or seizure, it will be necessary to resolve the claimant's motion to suppress before considering the government's position that the claimant's Rule G(6) discovery responses warrant a case-ending sanction.

## III

I now turn to how these rules should apply in this particular case.

### A. The Sufficiency of Porcelli's Discovery Responses

As an initial matter, and even if there were no Fourth Amendment issues in the case, the district court erred in striking Porcelli's claim based on the quality of his Rule G(6) interrogatory responses. Unlike the other claimant in our companion case that I discussed earlier (Ms. Henry), Porcelli eventually provided quite a bit of information in response to the government's Rule G(6) interrogatories.

As I recounted above, Porcelli explained that he earned the money by working for fifteen years in the movie industry. He provided his jobs, the names of companies he owned or was affiliated with, and information on his background and movie projects. He gave personal identifying information (his Social Security number, address, and so on), identified categories of documents supporting his claim, referenced a past accountant, and provided a bank account number for his production company. Porcelli further explained that "[s]ome of the money was acquired as cash initially, usually for the smaller projects, and some was initially checks or direct deposits or wire transfers or the like into my business account." Even

under the majority's rule, which purports to merely require claimants to provide "*some* evidence" that money in the car was his, Porcelli has clearly met that bar.  Maj. Op. 19.

The government complains that Porcelli's interrogatory responses "prevented the government from investigating and litigating" Porcelli's standing.  The majority curiously does not address this issue, but the government's argument is simply untrue.  Porcelli gave the government plenty to investigate and follow up on.  Porcelli's responses easily provided the basis for future document requests, third-party subpoenas, deposition questions, and so on.  Porcelli has given a plausible account of how one could earn and come to possess cash.  To the extent his account is implausible, that is only because of the large amount of money involved (more on that important issue in a moment).  As it stands, then, Porcelli's account is both sufficient to support standing and unrebutted, because the government did nothing to determine if Porcelli's story holds up.

The government did not "cast serious doubt on Porcelli's standing through its own evidence," as the majority claims.  Maj. Op. 21.  The government's motion to strike did not rely on any "earlier history" involving Porcelli.  Maj. Op. 21.  In fact, the motion to strike did not challenge Porcelli's standing at all.  So regardless of whether the government could have presented evidence to call into doubt Porcelli's claim of ownership, it chose to move to strike on the theory that Porcelli's interrogatory responses were inadequate.  And the government's reasoning for why the responses were implausible was premised entirely on evidence obtained from the potentially unlawful seizure.

So even before we get to the Fourth Amendment issues that are implicated here, it was clearly legal error for the

district court to strike Porcelli's claim for failure to respond to interrogatories to which he did respond. The majority twice tells us that the district court could have found that Porcelli should have provided "a bit more information" in response to the interrogatories. Maj. Op. 20–21. But if Porcelli merely fell short by "a bit," it is unclear why the majority thinks the facts are "egregious enough" to warrant the complete dismissal of Porcelli's entire claim. Maj. Op. 20–21.

The majority also repeatedly tells us that Porcelli could have responded with his average salary per year. Maj. Op. 19. n.5, 20, 24. But the district court never ordered Porcelli to provide that information, and it in fact gave no specific explanation as to why Porcelli's interrogatory responses were deficient. So while I agree that "flouting a court's discovery orders should not be done lightly," Maj. Op. 21 n.6, that is not what happened here. Porcelli responded to the interrogatories initially and amended his responses. The only additional information that would have satisfied the government and district court was Porcelli proving the legitimacy of his ownership, which contravenes CAFRA's burden of proof.

It is obvious that the salary information the majority has in mind would not have done the trick for the government, which was seeking *extensive* additional information from Porcelli. For example, in its motion to strike, the government claimed that Porcelli's responses were inadequate because he "did not supply specific transaction dates and details, usable identifiers and contact information for witnesses and persons of interest, and particularized document descriptions on a per transaction basis," and because he "provid[ed] no per-transaction details." This information goes well beyond the "narrow discovery" that

the majority says Rule G(6) allows, and it effectively puts the burden on Porcelli to prove legitimate ownership of the cash. Maj. Op. 6. Indeed, even the majority says that "an interrogatory that requires precise information (*e.g.*, dates, amounts) for dozens of transactions dating back years may be improperly onerous." Maj. Op. 24. But that is exactly what the government was seeking here.

Even before we get to the Fourth Amendment issues, then, in crediting the government's position the district court made one or both of the following errors. The court either thought that Porcelli had not come forward with information *sufficient* to establish his standing, when under our precedents he clearly had. Alternatively, or additionally, it accepted the government's position about the level of detail Porcelli was required to provide in Rule G(6) interrogatories, thereby improperly placing the burden of proof on Porcelli. Contrary to the majority opinion's assertions, Porcelli did not generically say without more that he earned money from past jobs; he instead provided various details that would have enabled further discovery. The government could have conducted additional discovery and demonstrated, for example, that Porcelli had not worked in the movie industry, that his bank account did not exist, and so on. But the government did not even try.

## B. The Fourth Amendment Overlay

Because Porcelli's explanation for how he came to earn money is not facially implausible, and because the information Porcelli provided in his Rule G(6) interrogatory responses is more than sufficient to allow the government to investigate his claim, the real reason that the majority is upholding the district court's case-ending sanction is because of the amount of money involved. The majority

thus repeatedly references the fact that Porcelli possessed over $1 million in cash in explaining why the district court could find Porcelli's interrogatory responses insufficient. Maj. Op. 20–21. The majority likewise reasons, again focusing on the amount of money, that "if the amount at issue had been only $1,000, then the district court may have found sufficient Porcelli's vague response that the money was from his prior jobs." Maj. Op. 24. Indeed, even the introduction to the majority's opinion leads with the large amount of cash involved. Maj. Op. 5–6. The government throughout its brief relied heavily on the same point. The majority thus expressly concludes that the district court could "consider[] the amount of money" in striking Porcelli's claim. Maj. Op. 23.

But the majority and government are making a critical error: they are evaluating the sufficiency of Porcelli's interrogatory responses and striking Porcelli's entire claim based on the amount of money involved, even though the amount of cash seized is the subject of a pending motion to suppress. Our precedents are clear that in a civil forfeiture case, "we cannot consider the amount of currency that the government illegally seized." *$493,850.00*, 518 F.3d at 1165 (citing *$191,910.00*, 16 F.3d at 1059, 1065); *see also id.* at 1166 ("[C]ourts may not introduce illegally seized currency into evidence or consider its amount . . . ."). Yet the majority opinion is placing dispositive weight on the amount of currency at issue in affirming the dismissal of Porcelli's claim, before any assessment has even been made as to whether the cash was illegally obtained. And beyond the cash itself, the majority opinion extensively discusses Porcelli's statements to law enforcement officers in suggesting that his account is incredible, even though these

statements would also be inadmissible if the search was illegal.

The result of all of this is that the government is succeeding in getting Porcelli's claim thrown out as a discovery sanction based on evidence that, if illegally obtained, could not be considered in a forfeiture proceeding, while at the same time avoiding any judicial inquiry into the lawfulness of the search itself. This is deeply problematic. The lesson of the majority opinion is that if the government wants to avoid a court ruling on the Fourth Amendment issues that could potentially result in summary judgment for the claimant, the government should instead bear down hard on the claimant's Rule G(6) interrogatory responses and win through an early discovery sanction. This is a significant misuse of the civil forfeiture process and one that is destined to incentivize unlawful searches and seizures.

The majority offers several arguments in support of allowing the district court to consider the amount of cash in levying a case-ending discovery sanction before any ruling on the motion to suppress. All of the majority's arguments are wrong.

*First*, the majority claims that "courts have held that a claimant cannot move forward with his motion to suppress until he has first established standing because Article III standing is a threshold issue that courts must resolve." Maj. Op. 22. But in three of the four cases the majority cites, the claimant failed to respond to the interrogatories at all. *See $39,000*, 951 F.3d 740; *United States v. Vazquez-Alvarez*, 760 F.3d 193, 196 (2nd Cir. 2014) (per curiam); *United States v. $321,470.00, U.S. Currency*, 874 F.2d 298, 300 (5th Cir. 1989). And in the last case, which was unpublished, the claimant had "disclaimed any ownership of or interest in the

money." *United States v. $1,185,135.00 in U.S. Currency*, 320 F. App'x 893, 894 (11th Cir. 2008) (per curiam).

As I have explained above, Porcelli in this case already came forward with information sufficient to establish his standing. Had the government moved to dismiss or moved for summary judgment on standing grounds, it would have lost. Thus, my approach does not "require[] a district court to address a motion to suppress before ascertaining Article III standing," Maj. Op. 22, since Porcelli undoubtedly did have Article III standing at this point of the proceedings.

The government was of course free to develop a record to show that Porcelli's claims of ownership were unsupported, and that he could only be carrying the money for someone else. Had the government sought to do this, the district court could have stayed resolution of the motion to suppress. But the government did not try to impeach Porcelli's assertions of standing. Instead, it sought to use information gleaned from a potentially unlawful seizure to argue that Porcelli's discovery responses were inadequate, while avoiding any ruling on the motion to suppress.

*Second*, the majority claims that the district court did not need to rule on the motion to suppress because "in resolving discovery disputes, a court generally does not have to decide beforehand whether a certain piece of evidence will ultimately be admissible." Maj. Op. 23. The majority thus writes as follows:

> Suppose a plaintiff seeks discovery on potentially embarrassing subjects that may ultimately be inadmissible because it may not fall within a hearsay exception or pass muster under Federal Rule of Evidence 403, and the

> defendant refuses to turn over discovery on those grounds. The district court has the discretion to sanction the defendant for not fulfilling his discovery obligations, even if it turns out that the discovery would not have been admissible at trial.

Maj. Op. 23.

This assertion is remarkable when one remembers that we are dealing here with a case-ending discovery sanction. If a defendant serves highly improper discovery requests on the plaintiff and the plaintiff refuses to respond, would a court simply dismiss the plaintiff's entire claim as a discovery sanction without even considering whether the discovery request itself was proper? Of course not. But that is what is happening here. The majority is justifying a dispositive sanction against Porcelli based on the amount of money at stake, when that amount may be something that could never be considered in the case going forward if the search was illegal. *See, e.g.*, *$493,850.00*, 518 F.3d at 1165; *$191,910.00*, 16 F.3d at 1071.

According to the majority opinion, however, "the district court could have considered the amount of money in determining the sufficiency of Porcelli's interrogatory responses, even if the court could have later deemed the amount of money inadmissible at summary judgment or trial." Maj. Op. 23. But if the amount of money seized cannot be considered at summary judgment or trial if the search violated the Fourth Amendment, how could it be considered here to achieve the same result—the government keeping the money—through a discovery sanction? The majority has no answer to this, and there is none. The majority says that "our court has held that we cannot

consider the amount of money in deciding the *merits* of a forfeiture claim *if* the court has already ruled that the money was illegally seized." Maj. Op. 22. But a court certainly could not *avoid* deciding a motion to suppress before deciding the merits of a forfeiture claim, because if the government's requested forfeiture turned on potentially tainted evidence, the court would have to rule on the motion to suppress first. The situation is no different here.

In fact, it is if anything worse, because Porcelli's claim is being tossed without any consideration of the merits at all. The majority opinion thus tells the government that if it is worried about a motion to suppress being granted later, it should just use the fruits of a possible Fourth Amendment violation to tee up a discovery violation where the Fourth Amendment issues will not be considered. That will lead to the entire civil forfeiture case being litigated through what is supposed to be the narrow Rule G(6) interrogatory device.

## C.  Conclusion

Given what the majority opinion allows in this case, the cautionary language it offers is both unintelligible and cold comfort. The majority opinion "stress[es] that district courts must carefully exercise their discretion based on the specific facts of each case, and should be wary of overly aggressive government agents and lawyers who may try to misuse the Rule G(6) discovery process." Maj. Op. 6. The majority also tells us that "[a] district court should not strike a claim willy-nilly based on the failure to fully comply with Rule G(6) interrogatories," and that it "should carefully consider the individual facts to ensure that the government is not trying to execute an end-run around its burden," "strik[ing] a claim only as a last resort." Maj. Op. 25.

It is unclear what any of this means or how district courts should suss out when the government is acting in an overly aggressive way. Nor does the majority offer any guidance on when the government will have crossed the line. But when the "specific facts of each case" that the majority opinion allows district courts to consider include facts that are the subject of a pending motion to suppress, then the majority is effectively providing claimants with no meaningful protection whatsoever.

The district court should have denied the government's motion to strike Porcelli's claim as a discovery sanction. Even if Porcelli had not raised any issues with the search that led police to discover the cash, given the sufficiency of his Rule G(6) responses at this early stage of the proceedings, the case should have proceeded through the normal discovery process, at which point the government could have moved for summary judgment on Porcelli's standing or on the ground that the property was subject to forfeiture based on its connection to criminal wrongdoing. But when Porcelli raised Fourth Amendment issues with the evidence seized and has asserted a legally sufficient basis for both his claimed ownership of the funds and his ability to challenge the search, Porcelli's motion to suppress would eventually need to be ruled on, unless the government had some other basis for seeking summary judgment that did not depend on the fruits of its search.

Rather than requiring the government to adhere to the protections that both the discovery process and the Fourth Amendment afford, the majority is letting the government control this case—and its taking of someone else's property—through its unilateral decision to press hard on Porcelli's interrogatory responses. This will lead the government to litigate every civil forfeiture case through the

Rule G(6) interrogatories, setting up inevitable case-ending discovery violations through the use of evidence that may have been illegally obtained. Today's decision will have profound consequences for the burden of proof, the frequency with which allegedly unlawful searches and seizures are subject to judicial examination, and the ability of bona fide owners to claim property that the government has wrongfully taken from them.

I respectfully dissent.